*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DERRICK ANTHONY-DWAYNE BROWN, also known as DERRICK ANTHONY-DEWAYNE BROWN,

        Defendant-Appellant.

UNPUBLISHED
February 07, 2025
11:34 AM

No. 360421
Kent Circuit Court
LC No. 19-010245-FC

Before: SWARTZLE, P.J., and K. F. KELLY and MURRAY, JJ.

PER CURIAM.

Defendant appeals by right his jury conviction of first-degree murder, MCL 750.316(1)(a), arising from the shooting death of victim Richard Dannah in May 2008. The trial court sentenced defendant as a third-offense habitual offender, MCL 769.11, to serve life in prison without the possibility of parole. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

The prosecutor presented testimony that the victim was shot and killed in the backyard of a home on 449 Adams Street, in Grand Rapids, Michigan, just before dawn on May 31, 2008. Jermonenia Lashaiawan Burrell ran an after-hours party out of the basement of that home, which was frequented by neighborhood residents and where gambling took place. Burrell had security at the back door of the home that guests used to enter the basement.

There was evidence that, on the night at issue, an individual named George Hunter lost a large sum of money to another individual, Kevin Harmon, playing dice. There was evidence that Hunter associated with the Highland neighborhood, as did defendant and the victim. There was also evidence that, just a short time before the night at issue, defendant had had a car accident involving Harmon after which Harmon assaulted defendant.

Testimony suggested that, at some point before the after-hours party shut down, some men from the Highland neighborhood decided to rob Harmon. Testimony demonstrated that Yolanda

-1-

Winfield pulled into the backyard of 449 Adams from the alley moments before Harmon left the party. Both the victim and defendant spoke to Winfield through the windows of her car. At about that time, Harmon and his associates left the basement. A man—purportedly Hunter—immediately began shooting at Harmon, and Harmon ran across the back of the home to a side path that led to the front. Harmon fell, and the first shooter yelled to a companion to "light" Harmon up and additional shots were heard.

Evidence technicians found shell casings from two different firearms at the scene. One group of nine-millimeter shell casings was found closer to the home and another closer to the alley. All the evidence showed that the shots came from the back of the house and were fired toward the house. Apparently, the victim was not the intended target and was unintentionally shot in the crossfire. A single bullet struck him in the side and caused severe internal damage, and he likely died at the scene.

Although there were numerous witnesses at the party and in the backyard, none of the witnesses cooperated with police officers. As a result, the crime went unsolved until 2018, when police officers began using investigative subpoenas to compel testimony from uncooperative witnesses, and the prosecutor was able to gather enough evidence to bring charges against Hunter and defendant for the shooting. Hunter's jury acquitted him, but defendant's jury found defendant guilty as noted above.

After defendant's conviction and sentence, defendant sought a *Ginther*[1] hearing to explore whether his trial attorneys were ineffective for failing to inform him of a conflict of interest they had concerning the case. Defendant also claimed his attorneys did not adequately investigate other possible suspects and failed to adequately impeach witnesses against him. The trial court denied the motion, and this appeal followed.

## II. STANDARDS OF REVIEW

This Court reviews a trial court's decision on a motion for a new trial for an abuse of discretion. *People v Cress*, 468 Mich 678, 691; 664 NW2d 174 (2003). This Court also reviews a trial court's decision whether to hold an evidentiary hearing for an abuse of discretion. *People v Unger*, 278 Mich App 216-217; 749 NW2d 272 (2008). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id*. at 217.

Ordinarily, a claim of ineffective assistance of counsel involves a mixed question of fact and law. *People v Haynes*, 338 Mich App 392, 429; 980 NW2d 66 (2021). When there are findings of fact, this Court reviews the findings for clear error. *Id*. This Court, however, "reviews de novo whether defense counsel's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms and whether, without the error, the result of the proceedings would have been different." *People v McFarlane*, 325 Mich App 507, 527; 926 NW2d 339 (2018). Because the trial court did not hold an evidentiary hearing to expand the record, there are no

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

findings of fact for this Court to review; for that reason, this Court's review is limited to mistakes that are apparent on the record alone. See *Haynes*, 338 Mich App at 429.

## III. CONFLICT OF INTEREST

Defendant first argues that his trial lawyers had a conflict of interest because their organization, the Kent County Office of the Defender, had earlier represented Thompson, who was a key witness against defendant. He claims that the conflict of interest amounted to ineffective assistance and that the trial court should have granted his motion for a new trial premised on that conflict. We disagree.

Defendant argued in the trial court, and continues to argue on appeal, that the two lawyers who represented him at trial—Marcus Chmiel and Alida Bryant—had an actual conflict of interest that amounted to a per se case of ineffective assistance of counsel. More specifically, defendant maintains that Chmiel and Bryant worked for the Office of the Defender and that lawyers from that same office represented a witness in the case, Michael Thompson, in other cases in which Thompson received a benefit for implicating defendant in the death of the victim. Defendant asserts that, at the very least, the trial court should have held an evidentiary hearing to compel the Office of the Defender to rebut the presumption that Thompson's lawyers shared information with defendant's lawyers or otherwise acted contrary to defendant's interests.

Defendant had the right to have the effective assistance of counsel at trial. See *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. In most cases, the defendant must not only demonstrate that counsel's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms, *id*. at 688, the defendant must also show that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different, *id*. at 694. Ineffective assistance is, however, presumed in some cases, such as in cases when the state has constructively denied the defendant the assistance of counsel. *Id*. at 692. Prejudice may also be presumed in some cases when a defendant's lawyer had an actual conflict of interest. *Id*.

Defendant's lawyers had a duty of loyalty to him, which included an obligation to avoid conflicts of interest. See *id*. at 688. In situations when a lawyer represents different defendants at the same time, a trial court must give a defendant who raises a challenge premised on a conflict of interest at trial the opportunity to show that a potential conflict impermissibly perils his or her right to a fair trial. *Cuyler v Sullivan*, 446 US 335, 348; 100 S Ct 1708; 64 L Ed 2d 333 (1980). Nevertheless, in the absence of an objection at trial, the trial court may "assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist." *Id*. If the defendant does not object at trial, then the defendant "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id*. at 348; see also *People v Smith*, 456 Mich 543, 556; 581 NW2d 654 (1998). To that end, the defendant must show an actual lapse in representation induced by the conflict of interest. *Cuyler*, 446 US at 348.

"[T]here is no automatic correlation between an attorney's theoretical self-interest and an ability to loyally serve a defendant." *Smith*, 456 Mich at 557. Whether a lawyer has an actual conflict of interest is normally a question of fact. *People v Pfaffle*, 246 Mich App 282, 288 n 5; 632 NW2d 162 (2001). Moreover, the existence of a conflict is never presumed or implied; rather, the defendant has the burden to establish a prima facie case of ineffective assistance premised on a conflict. *People v Lafay*, 182 Mich App 528, 530; 452 NW2d 852 (1990).

In the trial court, defendant identified evidence that Thompson had been represented during earlier proceedings on criminal matters by the Office of the Defender. A note by then Detective Craig Glowney showed that Thompson told his lawyer, Christopher Dennie from the Office of the Defender, that he had information about the victim's killing in August 2018. Thompson told Detective Glowney that he was not at the party, but he heard about the incident from Gary Phillips. Thompson said that the victim, defendant, and Hunter were waiting outside the after-hours house and had planned to rob Harmon. When Harmon left the house, something went wrong and they began shooting. Harmon ran, tried to jump a fence, and fell. The victim ran after Harmon and got shot accidentally. Thompson related that there was "bad blood" between defendant and Harmon over drug money.

Defendant further established that Thompson testified under two investigative subpoenas while represented by lawyers. He gave his first testimony in March 2018, but he did so without his lawyer present; that lawyer was apparently not from the Office of the Defender and represented Thompson on an entirely different criminal charge. Defendant also showed that Thompson again contacted the police department after he was arrested for a probation violation. After making that contact, Thompson again testified under an investigative subpoena on April 29, 2019. On that occasion, Thompson had two lawyers present: Michael Anderson and Nancy Balice. Anderson had been assigned to represent Thompson for a probation violation, and Balice represented him in a case arising from uttering and publishing. Anderson, who worked for the Office of the Defender, apparently negotiated with Thompson's probation officer to recommend time served for the violation. The prosecutor also apparently agreed not to object at an upcoming bond hearing on a criminal-sexual-conduct charge. The prosecutor clarified that she had said that she would simply leave it up to the judge—she did not make any promises.

In the trial court and on appeal, defendant maintains that this evidence established that his trial lawyers had an actual conflict of interest. He relies in part on the rules of professional conduct; specifically, on MRPC 1.7 and MRPC 1.9, which apply to the entire Office of the Defender under MRPC 1.10(a). Neither of those rules, however, established that his trial lawyers had an actual conflict of interest on the basis of the evidence that a lawyer from the same organization once represented Thompson.

MRPC 1.7(a) prohibits a lawyer from representing a "client if the representation of that client will be directly adverse to another client." The rule plainly applies to duel representation: the conflict only arises when the lawyer represents two different clients when the representation of one would be directly adverse to representation of the other. A lawyer is also prohibited from representing a client "if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person . . . ." MRPC 1.7(b).

Defendant conceded that Chmiel and Bryant were not Thompson's lawyers at the time of his criminal prosecution in this case. He nevertheless suggests that Anderson, who worked for the Office of the Defender, might still have been Thompson's lawyer for Thompson's probation violation when defendant was first charged in this case. He did not, however, present any evidence to support that position other than his theory that it was at least possible that the matter involving the probation violation was still pending after his arrest and that Anderson might still have been Thompson's lawyer.

The record showed that the trial court appointed the Office of the Defender to represent defendant on October 3, 2019. Months earlier in April 2019, Thompson stated that his lawyer, Anderson, had negotiated a recommended sentence of time served for the probation violation. Given the summary nature of a probation violation, see *People v Rial*, 399 Mich 431, 436; 249 NW2d 114 (1976), Thompson's statement in April 2019 was not sufficient evidence to establish a question of fact as to whether Anderson still represented Thompson as in October 2019. In other words, defendant's assertion amounted to speculation, not an offer of proof. But defendant had the burden to establish the factual predicates for his claims of ineffective assistance of counsel. See *People v Carbin*, 463 Mich 590, 601; 623 NW2d 884 (2001).

If the record did not itself establish a particular fact, then defendant had to develop the fact at an evidentiary hearing. See *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973). A *Ginther* hearing is not an opportunity to conduct a fishing expedition; rather, defendant had the burden to establish the need for a hearing through an offer of proof regarding the facts that might be established at the hearing. See MCR 7.211(C)(1)(a); see also *People v Lucas*, 393 Mich 522, 529; 227 NW2d 763 (1975); *People v Chapo*, 283 Mich App 360, 368-369; 770 NW2d 68 (2009). Defendant did not identify any evidence that a lawyer from the Office of the Defender still represented Thompson at any point during defendant's case. Defendant's speculation about the possibility that Anderson still represented Thompson was insufficient to warrant an evidentiary hearing. Accordingly, the trial court did not err when it determined that there was no evidence that the Officer of the Defender still represented Thompson as of the time that it began representing defendant and did not abuse its discretion when it denied defendant's request for a *Ginther* hearing premised on speculation. See *Unger*, 278 Mich App at 217. Similarly, because defendant failed to establish a question of fact on the issue of concurrent representation, the trial court did not err when it operated on the assumption that the Office of the Defender was not jointly representing Thompson and defendant at the same time.

In the absence of evidence that the Office of the Defender still represented Thompson, MRPC 1.7(a) did not apply, and MRPC 1.7(b) would only apply to the extent that Chmiel's and Bryant's representation might have been "materially limited" by their responsibilities to Thompson as a third person to the litigation. Defendant's appellate lawyer suggests that the Office of the Defender could not expose Thompson's lies out of fear that Thompson might be subjected to perjury charges, but the Office of the Defender had no such obligation. To the contrary, the Office of the Defender had the authority to reveal Thompson's confidences and secrets, even as a former client, "to the extent reasonably necessary to rectify the consequences of a client's illegal or fraudulent act," MRPC 1.6(c)(3), and its lawyers could also reveal Thompson's confidential information to prevent a crime, see MRPC 1.6(c)(4), such as perjury. The lawyers from the Office of the Defender were also prohibited from using false evidence, and they were obligated to correct false evidence that had been presented to a tribunal. See MRPC 3.3(a)(3). Accordingly, even to

the extent that the Office of the Defender owed duties to Thompson as a third person under MRPC 1.7(b), those duties did not prevent the Office of the Defender from attacking Thompson's credibility even if the attack exposed him to charges of perjury.

As the trial court correctly noted, MRPC 1.9 primarily governed any duties that the Office of the Defender might have owed to Thompson as a former client. The Officer of the Defender could not represent defendant "in the same or a substantially related matter" if defendant's "interests [were] materially adverse to the interests" of Thompson unless Thompson consented. MRPC 1.9(a). The same rule applied if a lawyer's former firm represented the former client, even if the lawyer did not himself or herself undertake the representation. See MRPC 1.9(b). The record showed that this case was not the same or a substantially related matter to any matter for which a lawyer from the Office of the Defender represented Thompson. As such, MRPC 1.9(a) and (b) did not apply.

Defendant also argues that the trial court had to presume prejudice on the basis of this Court's decision in *People v Davenport*, 280 Mich App 464; 760 NW2d 743 (2008). We find the analogy unpersuasive. This Court's analysis in *Davenport* established that when a lawyer who represents one party moves to another firm that represents the opposing party in the same action there is a presumption of shared confidences. *Id*. at 472-473. In such a case, there is an actual conflict for the lawyer who moved, which may be imputed to the lawyer's new firm as a whole. *Id*. at 473-474. This Court will presume that the lawyer who changed firms shared confidences with his or her new firm, and the new firm has the burden to demonstrate that there was no impropriety. *Id*. at 474-475.

In this case, the Office of the Defender represented Thompson in a previous, but unrelated, case. The Office of the Defender may have acquired confidences from Thompson through its lawyers, which in theory might have been shared with defendant's lawyers to Thompson's detriment, but there is no presumption that the confidences were shared because, unlike *Davenport*, the Office of the Defender was not representing defendant in the same or a substantially related matter as that involving Thompson. See MRPC 1.9(a) and (b). Additionally, unlike *Davenport*, defendant has not even identified an actual conflict of interest for the Office of the Defender by representing defendant even though it had previously represented Thompson, which would give rise to the burden-shifting approach adopted in *Davenport*.

The trial court correctly determined that defendant failed to establish any basis for holding a *Ginther* hearing on whether the Office of the Defender had an actual conflict of interest arising from its previous representation of Thompson. Defendant did not make any offer of proof on facts that, if true, would show that the Office of the Defender had an actual conflict of interest. Instead, defendant suggested that he wanted a hearing so that he could subject his trial lawyers to examination under oath. His desire to conduct an evidentiary hearing in the hopes that he might discover evidence to support his ineffective assistance of counsel claim was not, however, a sufficient basis for holding a *Ginther* hearing. See MCR 7.211(C)(1)(a). As such, the trial court did not abuse its discretion when it denied the request for a *Ginther* hearing on that ground. See *Unger*, 278 Mich App at 217. And we likewise decline his request for a *Ginther* hearing on that ground. See *People v Hernandez*, 443 Mich 1, 2-3; 503 NW2d 629 (1993).

Finally, because defendant failed to establish that his trial lawyers had any duties to Thompson that prevented them from vigorously advocating on defendant's behalf, defendant cannot show that his trial lawyers were constitutionally ineffective as a result of a conflict of interest. See *Cuyler*, 446 US at 349; *Smith*, 456 Mich at 556. In the absence of any indication that his trial lawyers had an actual conflict of interest, defendant's complaints about his trial lawyers' cross-examination of Thompson must be evaluated under the framework applicable to an ordinary claim for ineffective assistance of counsel, as provided under *Strickland*. Consequently, we conclude that the trial court did not abuse its discretion when it denied defendant's motion for a new trial premised on a conflict of interest. See *Unger*, 278 Mich App at 217.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next raises a series of claims that his trial lawyers provided ineffective assistance by failing to properly investigate alternative suspects and by failing to properly cross-examine witnesses against him. Defendant is not entitled to any relief on the basis of these purported errors.

## A. ALTERNATE SUSPECT

Defendant first contends that trial counsel provided ineffective assistance by failing to investigate and present evidence that Cedric Collier was the real shooter, not defendant. We disagree.

To establish his claims of ineffective assistance, defendant must demonstrate that counsel's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different. See *Haynes*, 338 Mich App at 429. Effective assistance is strongly presumed, and defendant has the heavy burden to prove otherwise. See *id*. For that reason, "[i]f this Court can conceive of a legitimate strategic reason for trial counsel's act or omission, this Court cannot conclude that the act or omission fell below an objective standard of reasonableness." *Id*. at 429-430.

To make a reasoned decision about whether evidence is worth presenting at trial, a trial lawyer must first know what the evidence establishes. *People v Ackley*, 497 Mich 381, 393; 870 NW2d 858 (2015). To that end, defense counsel had a duty to investigate the evidence to prepare for trial; that duty, as the Supreme Court of the United States explained, must be assessed through the lens of reasonableness:

> These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case. As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly

assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. [*Strickland*, 466 US at 690-691.]

On appeal and in the trial court, defendant presented evidence that officers made notations referring to the earlier murder of Steven Ivy and speculating about whether the shooting of the victim might have been in retaliation for Ivy's death, because the victim was a suspect in that case. The reports showed that various persons had reported that the victim was killed in retaliation for Ivy's death. The victim's mother also told an officer that the victim had been brought to court to speak about the shooting death of Ivy and that a different unknown witness may have seen the victim at the court.

Police notes from May 2008 showed that Burrell described an incident during the party on the night at issue in which a man kissed another man on the lips, which caused an altercation. Burrell called that man "the kisser." Burrell initially stated that the kisser was the man who first started to shoot at Harmon when Harmon left the basement and that an unknown man who dragged the kisser out of the house was the second shooter. In that same interview, Burrell told the officer that defendant intended to rob Harmon.

At another interview in June 2008, Detective Glowney noted that he showed a photo lineup to Burrell and that Burrell identified the photo of a man as being "similar" to the kisser. Burrell later related that the person depicted in the photo was the kisser. The photo was of Cedric Collier, who was Ivy's cousin. But Burrell also related that defendant was behind the shooting at that same interview.

This evidence, had it been presented at an evidentiary hearing, would have been sufficient to establish that a reasonable defense lawyer would have investigated whether it would be possible to implicate Collier as an alternate suspect in the victim's death. Moreover, had Chmiel admitted that he did not conduct an investigation, that evidence would tend to establish that Chmiel's failure to better investigate Collier fell below an objective standard of reasonableness under prevailing professional norms. Nevertheless, there was no evidence that, had Chmiel conducted a more thorough investigation into this defense, he would have discovered exculpatory evidence to establish that Collier was the real shooter and that he was firing at the victim in retaliation for Ivy's murder. As the prosecution aptly notes on appeal, investigators were unable to identify any evidence connecting Collier to the shooting beyond Burrell's initial identification in 2008.

Defendant has not identified any further evidence that might have substantiated Burrell's identification. Defendant presented an affidavit by an investigator to support his request for a *Ginther* hearing, but the investigator only offered general averments concerning Chmiel's workload and his knowledge that the victim was a suspect in Ivy's death. She did not identify any evidence that might have been admissible to implicate Collier as an alternate suspect. Although defendant identified documents that showed that further factual development might advance his claim that Chmiel failed to make a proper investigation, see *Chapo*, 283 Mich App at 368-369, he failed to show that the failure to investigate deprived him of the ability to present evidence that Collier was the real shooter. At best, defendant's offer of proof established that a *Ginther* hearing would have shown that Chmiel did not investigate for further evidence that Collier had a motive to kill the victim. That being said, there was no basis for concluding that Chmiel's investigation

would have revealed evidence that would have allowed the defense to argue that Collier was motivated to shoot the victim as a result of his participation in the robbery and murder of Ivy. Because the trial court could decide the import of Chmiel's failure to investigate without the need for an evidentiary hearing, the trial court did not abuse its discretion when it denied defendant's request for a *Ginther* hearing to explore this claim of error. See *Unger*, 278 Mich App at 217.

## B. IMPEACHMENT: THOMPSON

Defendant next maintains that defense counsel provided ineffective assistance by failing to better impeach Michael Thompson, a witness to the shooting. Specifically, defendant argues that defense counsel should have shown that Thompson's story evolved over time and that it evolved only after the prosecutor fed him facts and after he spoke with others and heard their versions of events. Defendant also argues that his attorneys also should have shown that Thompson lied when he said that he received nothing in exchange for his testimony.

Thompson provided police officers with three different versions of his understanding of events from that night. In the first version, he stated that he was not present and was merely relating things that he heard from Gary Phillips, defendant's cousin who was with Harmon when the shooting began. Thompson told Detective Glowney that Phillips identified defendant as the shooter and that Phillips told him that defendant was with Hunter and the victim when the shooting started. In a second version, which was given under oath in 2018, Thompson repeatedly asserted that he could not recall the events of that night, but he nevertheless said that he was at the party on that night. He claimed that he heard gunshots on that night and related that he was either outside the house or down the street. He then changed his story and said that he was sitting in a car with a woman when he heard the shots. He informed the prosecutor that he saw someone come from behind the house with a gun, but he did not recall who it was. Thompson related that the word on the street was that the victim was not the target—his shooting was an accident. He further heard on the street that defendant was involved. Thompson provided a third version under oath in 2019. In that version, Thompson at first restated his claim that he was outside the house in a car with a woman. For the first time, Thompson claimed to have seen Harmon and defendant with guns and exchanging fire. He stated that Harmon was moving to the front of the house as defendant was retreating toward the alley behind the house. When the prosecutor and detectives questioned Thompson's ability to see the alley from the front of the house and suggested that he was again just relating what others had told him, Thompson vacillated. He complained that the prosecutor and detectives were not concerned with his safety and he stated that he did not want to implicate a bunch of people. After the prosecutor threatened him with perjury charges, Thompson said that he wished to change his testimony. It was then that Thompson stated that he was actually coming down the alley from the home of his child's mother when the shooting happened. He stated that he saw Harmon leaving the house with Phillips and "Tap." He saw defendant with a gun and saw him shoot at Harmon. Defendant argues that defense counsel should have subjected Thompson to cross-examination that would have highlighted the differences in these versions and should have pointed out that the prosecutor fed Thompson facts.

The transcripts of the two versions that Thompson gave under oath do not support that the prosecutor fed any facts to Thompson. Rather, the transcript of the second interview under oath showed that the prosecutor challenged Thompson's veracity on the basis of obvious impossibility that someone sitting in a car in the front of the house would be able to see a shooting that occurred

in the backyard in the dark. She then threatened him with perjury charges. At that point, Thompson related a version that explained how he knew the facts: namely, that defendant was firing a gun that night and that he was shooting at Harmon. Accordingly, Chmiel cannot be faulted for failing to argue that the prosecutor fed facts to Thompson because the record did not support that claim. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Moreover, an effective trial lawyer could reasonably conclude that getting into the details of Thompson's different versions might have placed greater emphasis on Thompson's consistent identification of defendant as a shooter and might have opened the door to harmful testimony. See *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999) (stating that whether and how to examine a witness is a matter of trial strategy).

Moreover, Chmiel's chosen strategy was competent. Chmiel cross-examined Thompson and got Thompson to testify that the people who ran the gambling house did not always search people that they knew, which supported the defense theory that Harmon or one of his associates might have been able to get a gun into the house. He also got Thompson to admit that he might have been on cocaine or marijuana that morning. Chmiel's cross-examination of Thompson brought out clear deficiencies in Thompson's story that undermined the weight and credibility to be afforded his testimony. And while Chmiel did not specifically highlight Thompson's testimony in his closing, he noted that the witnesses were not relating facts but rather were relating stories about the events at issue.

Defendant also argues that defense counsel provided ineffective assistance by failing to show that Thompson lied when he testified that he did not receive anything for his testimony when he had in fact received consideration years earlier. Thompson testified at defendant's trial in 2021, and agreed that he was currently incarcerated on an unrelated matter. He further agreed that the prosecutor had not made any "promises or offers" for his testimony "here today." Although defendant now claims that Thompson's testimony was false because he received consideration for his testimony in 2019 under the investigative subpoena, as the record clearly showed, Thompson did not testify that he did not receive *consideration* for his cooperation in 2019, he affirmed that he did not receive any *promises* for his testimony on the day of trial. Chmiel had no obligation to try and correct that testimony because there was no basis for concluding that Thompson had been offered anything for his testimony on that day. See *Ericksen*, 288 Mich App at 201. Additionally, Chmiel could reasonably conclude that cross-examining Thompson about the quite limited consideration that he received in 2019 would not be helpful.

The fact that Chmiel's strategy did not work did not establish that the decision to pursue that strategy amounted to ineffective assistance. See *People v Stewart (On Remand)*, 219 Mich App 38, 42; 555 NW2d 715 (1996). Defendant has not shown, therefore, that Chmiel's chosen method for cross-examining Thompson fell below an objective standard of reasonableness under prevailing professional norms. See *Haynes*, 338 Mich App at 429.

C. IMPEACHMENT: MERRITT

Defendant maintains that defense counsel should have better handled the testimony of Marquis Merritt, another witness, as well. Specifically, defendant argues that after Merritt professed to being unable to remember anything that defendant said to him in a conversation that they had, defense counsel should have objected to the prosecutor's request to admit Merritt's

testimony from defendant's preliminary examination on the ground that it violated his right to confront Merritt. As an alternative, defendant states that defense counsel should, at the very least, have moved to admit Merritt's testimony from the investigative subpoena because that transcript would have showed that Merritt misstated the timing of when he spoke to defendant by several years.

The Michigan Supreme Court recently explained the contours of a defendant's right to confront the witnesses against him or her:

> The Sixth Amendment of the United States Constitution and Article 1, § 20 of Michigan's Constitution provide a defendant with the right to confront the witnesses against him. "The right of confrontation insures [sic] that the witness testifies under oath at trial, is available for cross-examination, and allows the jury to observe the demeanor of the witness." *People v Yost*, 278 Mich App 341, 370; 749 NW2d 753 (2008) (quotation marks and citations omitted). Thus, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v Washington*, 541 US 36, 59; 124 S Ct 1354; 158 L Ed 2d 177 (2004). A statement is "testimonial" if it was "made 'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]' " [*People v*] *Fackelman*, 489 Mich [515, 556; 802 NW2d 552 (2011)], quoting *Crawford*, 541 US at 51-52 (brackets in *Fackelman*). But, even if the statement is testimonial, "the Confrontation Clause applies only to statements used as substantive evidence." *Fackelman*, 489 Mich at 528. "The [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 US at 60 n 9. [*People v Washington*, ___ Mich ___, ___; ___ NW3d ___ (2024) (Docket No. 165296); slip op at 6.]

The prosecutor called Merritt to testify about Merritt's previous statements in which he indicated that defendant told him about the shooting. Merritt was a reluctant witness for the prosecution, and he repeatedly asserted that he could not recall what defendant told him in their conversation. He testified that he did not remember talking to a detective back in 2018. He also testified that he did not even recall his testimony at the preliminary examination held in November 2019.

Under the rules of evidence, Merritt was unavailable for purposes of the hearsay rule. See MRE 804(a)(3). Accordingly, his previous testimony from the preliminary examination was substantively admissible. See MRE 804(b)(1). Moreover, Chmiel cross-examined Merritt at the preliminary examination, and he had similar motivation to develop Merritt's testimony. See *People v Adams*, 233 Mich App 652, 659; 592 NW2d 794 (1999). The Confrontation Clause only guarantees the opportunity to cross-examine a witness, it does not guarantee cross-examination that is effective in whatever way and to whatever extent that the defense might wish. See *United States v Owens*, 484 US 554, 559; 108 S Ct 838; 98 L Ed 2d 951 (1988). Because defendant had an adequate opportunity to confront Merritt at the preliminary examination, the trial court's decision to admit

the transcript was proper under the rules of evidence and did not violate defendant's right to confront the witnesses against him. See *Washington*, ___ Mich at ___ ; slip op at 6; see also *Yost*, 278 Mich App at 370-371. Although Chmiel only objected to the admission of the preliminary examination testimony on the ground that he did not agree that Merritt was unavailable, had he objected on confrontation grounds, that objection would have been meritless. A claim of ineffective assistance cannot be predicated on a meritless motion. *Ericksen*, 288 Mich App at 201. Therefore, defendant has not shown that Chmiel's failure to object on that basis fell below an objective standard of reasonableness under prevailing professional norms.

Defendant's claim that Chmiel should have moved to admit Merritt's testimony from his investigative subpoena is also unavailing. In most respects, Merritt's testimony under the investigative subpoena mirrored his testimony from the preliminary examination. He claimed that he spoke to defendant and defendant told him that they were trying to rob someone and they just started shooting. Defendant also said that he thought he might have hit the victim. Merritt testified that he thought he talked to defendant in 2009 because that was when he first went to prison. He changed his testimony, however, after a detective pointed out that defendant did not get convicted of robbery until 2013. Merritt explained that he had gone to prison twice—once in 2009 and again in 2013—and he might have mixed up the years.

Given that Merritt's testimony was largely consistent from one telling to the other, Chmiel could reasonably conclude that admitting the transcript from the investigative subpoena would not be helpful. Additionally, Chmiel may have wished to avoid eliciting testimony to explain Merritt's discrepancy—namely, he may have wanted to avoid having the jury learn that Merritt and defendant were imprisoned at the same time and that defendant was serving a 30-year sentence for robbery. Because we can conceive of a legitimate strategic reason for Chmiel's decision not to request the admission of the transcript, we cannot conclude that Chmiel's decision fell below an objective standard of reasonableness under prevailing professional norms. See *Haynes*, 338 Mich App at 329-330.

## D.  IMPEACHMENT: PRYOR

Defendant also claims that defense counsel should have done a better job of impeaching a third witness, Arthur Pryor. Specifically, defendant argues that Chmiel should have emphasized that, according to Pryor's version of events, the shooting must have occurred at about 12:30 a.m., which was contradicted by the overwhelming evidence.

Defendant is correct that the evidence showed that Pryor could not have been around during the shooting if he actually left the party at about 12:30 a.m. He must, therefore, have been mistaken about being present for the shooting or about the time when he left the house. That discrepancy, however, would have been patently obvious to the jury without the need to highlight it during cross-examination. Had Chmiel chosen to cross-examine Pryor about his timing, Pryor likely would have corrected his testimony and explained the discrepancy, which would have only rehabilitated his testimony. Given that risk, a reasonable defense lawyer might leave the blatant discrepancy unchallenged. As such, it did not amount to ineffective assistance, and defendant is not entitled to a new trial on this basis. See *id*.

## V. COLLATERAL ESTOPPEL

Defendant next argues that defense counsel was ineffective for failing to assert collateral estoppel as a defense to the prosecution's theory that the jury could find defendant guilty of murder on the theory that he aided and abetted Hunter. More specifically, he maintained that, because a jury acquitted Hunter of assaulting Harmon with the intent to murder him, collateral estoppel barred the prosecutor from relitigating whether Hunter shot at Harmon. We disagree.

The doctrine of collateral estoppel applies to criminal prosecutions. *People v Brown*, 279 Mich App 116, 126; 755 NW2d 664 (2008). The doctrine bars relitigation of an issue in a subsequent case when the subsequent case involves the same parties and the prior case culminated in a valid, final judgment in which the issue was both actually litigated and necessarily determined. *Id*. This case involved a charge of murder against defendant arising from the death of the victim. Defendant was not a party to the earlier case involving Hunter and Hunter was not a party to this case. Additionally, Hunter was not charged with killing the victim. On these facts, the doctrine of collateral estoppel does not apply. See *id*. And because collateral estoppel did not apply as a bar to the charge at issue, defendant's trial lawyers cannot be faulted for failing to raise such a challenge. See *Ericksen*, 288 Mich App at 201.

## VI. WINFIELD'S TESTIMONY

Defendant also challenges defense counsel's failure to object to the prosecutor's use of statements by a deceased witness, Jennifer Miller, to impeach a claim by Yolanda Winfield, a witness, that Winfield could not identify the shooter who ran past her car. More specifically, defendant claims that defense counsel should have objected to the impeachment on confrontation grounds.

Before calling Winfield to testify, the prosecutor informed the trial court that she might need to impeach Winfield with statements that Winfield made to Miller when they were both incarcerated in the same jail pod. Defense counsel agreed that there would be no confrontation issue if the prosecutor did not try to admit Miller's actual testimony, but instead limited her impeachment to questioning Winfield about whether she made certain statements to Miller. He stated that there would only be a confrontation issue if the prosecutor tried to admit Miller's statements from the investigative subpoena because he did not have a chance to cross-examine Miller at the investigative subpoena.

At trial, Winfield—who had a child in common with defendant—testified that she could not identify any of the shooters despite the fact that she was seated in her car in the backyard as the shooting happened. She also stated that she did not recall where defendant was during the shooting. She reiterated that she did not know who any of the shooters were, and she told the jury that she never saw a shooter so as to be able to identify the shooter. After that last statement, the following exchange occurred:

> *Q*. Do you know someone by the name of Jennifer Miller?
>
> *A*. No, I do not.

*Q.* Do you remember speaking with that person in the Kent County Jail back in 2012?

*A.* Yes.

*Q.* Do you remember talking to her about this case?

*A.* Yep.

*Q.* And you gave her details and information about this case, is that correct?

*A.* Yes.

*Q.* So why did you tell her that you saw [defendant] shooting that night?

*A.* I didn't tell her I saw [defendant] shooting that night. That's the whole thing.

*Q.* You didn't tell her that you think that he's going to get away with this because you're not talking?

*A.* No, I did not.

*Q.* Or that you would not snitch on your baby's daddy if you had to?

*A.* No, I did not.

*Q.* What does that tattoo on your arm say?

*A.* Loyalty.

The prosecutor had the right to impeach Winfield under MRE 607, even if the prior inconsistent statement tended to directly inculpate defendant. See *People v Kilbourn*, 454 Mich 677, 682; 563 NW2d 669 (1997). Moreover, it was entirely proper to impeach her using her prior inconsistent statements to Miller, see MRE 613, and the questions about the inconsistent statements did not implicate the Confrontation Clause because they were not being offered as substantive evidence, see *Washington*, ___ Mich at ___ ; slip op at 6. Rather, the questions all explored Winfield's credibility when she denied seeing that one of the shooters was defendant. Because the questions did not implicate the Confrontation Clause, trial counsel cannot be faulted for failing to challenge the questions on that basis. See *Ericksen*, 288 Mich App at 201.

On appeal, defendant asserts that the prosecutor improperly inserted Miller's statements into her questions and argues that the jury must have taken Miller's statements for the truth of the matter asserted without defendant having the opportunity to cross-examine Miller. When there is a danger that the jury will use the inconsistent statement as substantive evidence, it is proper to instruct the jury on the proper use of the inconsistent statement. *Tennessee v Street*, 471 US 409, 414-415; 105 S Ct 2078; 85 L Ed 2d 425 (1985). Defendant maintains that trial counsel provided ineffective assistance by failing to ask for such a limiting instruction.

-14-

Trial counsel may have chosen not to request a specific instruction on the proper use of the impeachment questions because he knew that the trial court would instruct the jury that the prosecutor's questions were not evidence and felt that that instruction would be adequate to protect defendant's rights. Additionally, he may have felt that a more specific instruction would simply serve to highlight the impeachment to defendant's detriment. See *People v Robinson*, 154 Mich App 92, 93; 397 NW2d 229 (1986). Because we can conceive of a legitimate strategic reason for the decision, it cannot be said that the decision fell below an objective standard of reasonableness under prevailing professional norms. See *Haynes*, 338 Mich App at 329-330.[2]

Affirmed.

/s/ Brock A. Swartzle
/s/ Kirsten Frank Kelly
/s/ Christopher M. Murray

---

[2] Defendant asserts that he needed to have a *Ginther* hearing to establish all of his claims of error and argues that, even if no one error that he identified warrants a new trial, the cumulative effect of the errors warrants a new trial. However, as discussed in this opinion, there are no errors to accumulate, and defendant is not entitled to relief on the basis of the accumulation of error. See *People v LeBlanc*, 465 Mich 575, 591 n 12; 640 NW2d 246 (2002)